THOMAS JORDAN, Inc., et al., Appellants,

v.

SKELLY OIL COMPANY et al., Appellees.

No. 6886.

Court of Civil Appeals of Texas.

Texarkana.

Nov. 8, 1956.

Rehearing Denied Dec. 6, 1956.

John Ben Shepperd, Atty. Gen., J. Arthur Sandlin, Asst. Atty. Gen., Dillard Baker, James N. Erwin, Jr., Houston, W. H. Sanford, Conan Cantwell, Dallas, for appellants.

Turner, Rodgers, Winn, Scurlock & Terry, Carlton R. Winn, Lon Sailers, George S. Terry, Dallas, L. A. Thompson, Tulsa, Okl., J. K. Smith, Ft. Worth, James E. Hara, Tulsa, Okl., for appellees.

FANNING, Justice.

This is a boundary suit cast in the form of a trespass to try title suit, for the recovery of 129 acres of land, more or less, alleged to be a part of the Clark Simmons Survey in Marion County, Texas, and for an accounting for oil produced by defendants from oil wells on said tract. Plaintiffs in the case were landowners, holding and claiming under the said Clark Simmons

survey, which survey was patented on February 8, 1854. The list of plaintiffs includes D. C. Rowell, W. Torrans Rowell; their two sisters, Mrs. Fannie Myers and her husband, W. F. Myers, and Mrs. Katherine Birmingham and her husband, A. L. Birmingham; Isidore Segal; George Earl Haggard; and various heirs of Felix Lewis, together with their respective mineral assignees, and lessees, Stanolind Oil & Gas Company and Skelly Oil Company. Defendants in the case were Thomas Jordan, Inc., and Humble Oil & Refining Company, who were claimants under an oil and gas lease from the State of Texas, dated June 15, 1950, covering a part of Mineral File 24,205, also known as the O. P. Deaner File. The State of Texas intervened as a defendant in the cause. The accounting features of the case were severed out; the boundary case was tried to the court without a jury and judgment was rendered for the plaintiffs for the title and possession of the tract sued for. The trial court filed findings of fact, an amendment thereto, and conclusions of law. Defendants' objections and exceptions to the trial court's findings were overruled. Defendants, including the State of Texas, have appealed.

On February 4, 1854, the State of Texas issued its Patent No. 743 to "John Woodley, Assignee of Clark Simmons," in which are found the following recitations and field notes:

"do by these presents grant to John Woodley, Assignee of Clark Simmons, his heirs and assigns forever, nine hundred and eighty and a half acres of land, situated and described as follows:

"In Cass County, near Black and Big Cypress, on Ferry Lake, being the tract on which the town of Smithland is located, * * *

"Beginning at the S. E. corner of a survey in the name of Isaac Jones, on the N. W. line of B. F. Lynn's Survey a stake from which a pine bears S. 45° W. 8 varas, another

bears S. 70° W. 6 varas both marked J. W.

"Thence West, 1746 varas to a stake on the south line of M. R. Jones' Survey, from which a black oak bears S. 20° E. 14 varas, another bears S. 29° E. 24 varas, both marked J. W.

"Thence South 45° W. 3300 varas to a forked water oak, on the north side of Ferry Lake, near the junction of Big and Black Cypress, from which an elm bears S. 92° W. 8½ varas, a pine bears S. 70° E. all marked J. W.

"Thence South 45° E. 1389 varas to B. F. Lynn's N. W. line. Thence North 45° E. with the N. W. line of said Lynn's Survey to the place of beginning."

Appellees' theory of the case is illustrated by its Exhibit No. 186, which shows the Clark Simmons Survey to be a riparian survey including the old town of Smithland and showing no vacancy between the Clark Simmons Survey and the river (or Ferry Lake). A copy of Plaintiffs' Exhibit No. 186 was attached and made a part of the trial court's findings. Appellants contend that the Clark Simmons Survey should be constructed largely on calls for course and distance and that in particular the southwest boundary of the Clark Simmons Survey was a straight line as called for in its field notes, and was not the river or lake. Appellants' various theories are illustrated by Defendants' Exhibit No. 9 which shows the Clark Simmons Survey as not extending to the river and leaving a vacancy of 129 acres of land, more or less, between the Clark Simmons Survey and the river (or Ferry Lake). We here attach copies of Plaintiffs' Exhibit No. 186 and Defendants' Exhibit No. 9. We also attach herewith a copy of Plaintiffs' Exhibit No. 1, which is plaintiffs' basic map of the Clark Simmons and surrounding area as constructed by plaintiffs.

(Note: The Clark Simmons Survey when patented in 1854 was in Cass County, Texas. It is now in Marion County, Texas.)

CLARK SIMMONS
AND LIGHTFOOT SURVEYS
WITH INTERIOR SUBDIVISIONS

CLARK SIMMONS
AND LIGHTFOOT SURVEYS
WITH INTERIOR SUBDIVISIONS

The trial court filed detailed and complete findings of fact, an amendment thereto, and conclusions of law. We quote (in part) from such findings, amendment, and conclusions as follows:

Findings of Fact

"1. I find the following facts with reference to the body of water variously referred to as Caddo Lake, Black Cypress

Bayou, Big Cypress Bayou and Ferry Lake during the period 1839–1874, both inclusive:

"(a) That Caddo Lake, or Ferry Lake, located partly in the Eastern portion of Marion County and partly across the State line of Louisiana, was during the period in question, generally known as Ferry Lake.

"(b) That the waters of Black Cypress and of Big Cypress Bayou emptied into Ferry Lake, and in fact that the level of water in Ferry Lake extended back up the Big Cypress as far as the old river town of Smithland, and that Big Cypress and Black Cypress were both during the period in question interchangeably referred to by surveyors and others, as Ferry Lake.

"(c) That the mean high water elevation of Ferry Lake and of Cypress Bayou opposite the old river town of Smithland during such period of time was 173.09 feet above mean sea level as reflected by the findings and testimony of Arthur Kidder, Surveyor General of the United States, of Lionel L. Janes, United States Government Ecologist, and of Frank Lereritt, United States Government ·Geologist, in the 'Ferry Lake Cases,' and as reflected by the findings of the Special Master in the Trial Court, in the subsequent judgments of the Trial Court, the Circuit Court of Appeals and the United States Supreme Court in United States v. Lane, No. 1153, United States v. Greene, No. 1155, and United States v. Jeemes, Bayou Hunting and Fishing Club, No. 1157, and others.

"(d) That the mean or average elevation of Ferry Lake or of Big and Black Cypress Bayou in the immediate vicinity of the Clark Simmons Survey in Marion County during the period in question was 170 feet above mean sea level.

"2. I find further that the river town of Smithland in Marion County was established sometime prior to 1839, and that it was located on the North or Northeast bank of Big Cypress Bayou, at the point where Thompson's Fishing Camp now stands. I find further that Smithland was a river town and was so used by the people living in that section of the country, as well as in other distant parts of the state, by people receiving their goods and merchandise by ships coming up the Red River from New Orleans and unloading their goods at Smithland, to be loaded again in wagons and ox-carts to be carried to various parts of North and East Texas.

"3. (a) (As amended) I find as a fact that the general course of Black Cypress and Big Cypress near the site of old Smithland is as shown on Plaintiffs' Exhibit No. 186.

"(b) I find further that as early as March 20, 1840, the course of the river at this point was considered to be South 45° East, by W. J. Hamilton, District Surveyor of Red River County, who located a now cancelled survey of 640 acres for William F. Johnson 'on the Big Cypress immediately below the mouth of the Black Cypress, including what is now known as the town of Smithland' and 'beginning at a stake on the bank of Black Cypress * * *, thence with the meanders of Big Cypress South 45° East 950 varas to a white oak tree on the bank of the Cypress, thence North 45° East, etc.'

"(c) I find further that on June 6, 1844, R. C. Graham, District Surveyor of Bowie County, in making the original location of the Clark Simmons Survey, put its two most Southerly corners, one 'at a forked water oak at or near the junction of Big Cypress and Black Cypress,' and the other at 'a water oak standing on the bank of Ferry Lake.' The course between these two points he described as North 45° West, and I find that from his official plat this call was meant to be the meander line or along the course of the river.

"(d) I find further as a fact that when M. L. Mullens wrote corrected field notes for the Clark Simmons Survey it was his intention that the call of 'South 45° East' from its Northwest corner at the forked water oak, be a meander call for the river along its general course of South 45° East.

"4. (a) The original field notes of the Clark Simmons Survey, as surveyed on June 6, 1844, by R. C. Graham, describes its most Westerly corner as 'beginning at a forked water oak standing on the North side of Ferry Lake at or near the junction of Big Cypress and Black Cypress.'

"(b) The field notes of the Henry S. Lightfoot Survey, written on April 5, 1850, by Benjamin D. Kimbell, County Surveyor of Cass County, describe the starting point as 'beginning at a double water oak marked JW on the bank of Black Cypress near its mouth.'

"(c) The corrected field notes of the Clark Simmons Survey, written on November 2, 1850, by M. L. Mullens, County Surveyor, Cass County, described the most Westerly corner as being marked by 'a forked water oak standing on the North side of Ferry Lake and near the junction of Big Cypress and Black Cypress.'

"(d) The field notes of the Samuel F. Moseley Survey, written by Hugh Hensey, Deputy Surveyor of Cass District, on October 15, 1860, describe its southeast corner as being at 'the West corner of Woodley's Survey on the bank of the lake, a double water oak corner.'

"(e) I find as a fact that the 'double water oak marked JW', or the 'forked water oak' called for in each one of the four sets of field notes listed immediately above was one and the same tree.

"(f) (As amended) I further find as a fact that such 'forked water oak' used as the common corner of the Clark Simmons Survey, the Henry S. Lightfoot Survey, and Samuel F. Moseley Survey, originally stood on the ground at the point represented by figure 196 on plaintiffs' map, Exhibit 186, the position of said tree being more specifically described as follows:

"A point on the East bank of Black Cypress Bayou, which is North 44° 20' West 731.65 varas and South 45° 40' West 41.19 varas from an oil well drilled by Thomas

Jordan on the area in controversy as well number one.

"And South 45° 40' West 977.53 varas from the gun or rifle barrel described in the deed from J. D. Lamar and wife, Victoria Todd Lamar and Susan Todd to Joe Mercer, which deed was dated October 12, 1897, located at point number 319 on Plaintiffs' Exhibit 186.

(Note: Finding 5 locates the gun or rifle barrel point at figure 319 on Plaintiffs' Exhibit 186. Finding 6 locates the original North or Northwest corner of the Simmons at figure 117 on Plaintiffs' Exhibit 186. Finding 7 locates the original East or Northeast corner of the Simmons at figure 101 on Plaintiffs' Exhibit 186.)

"8. I find as a fact that the South or Southeast corner of the Clark Simmons is located at a position represented by figure 20 on plaintiffs' Exhibit No. 186, which is on the Northeast bank of Big Cypress Bayou at the West corner of the B. F. Lynn Survey, and South 45° East 4 varas and South 44° 56½' West 11.8 varas from a Pine stump about 3 feet high and 30 inches in diameter located on the high bank of Big Cypress Bayou near the South or Southwest corner of the Clark Simmons Survey and the West corner of the B. F. Lynn Survey.

"9. I further find as a fact that by including in the corrected field notes and patent of the Clark Simmons Survey the language 'near Black and Big Cypress on Ferry Lake,' the State and its surveyor, M. L. Mullens, intended for such language to be locative in nature and to specifically designate the river as the Southwest boundary of the Clark Simmons Survey.

"10. I further find as a fact that the official plat prepared by M. L. Mullens and returned to the General Land Office as a part of such field notes, conclusively reflects the intention of the surveyor, Mullens, and of the State of Texas that the river be the Southwest boundary of the Clark Simmons Survey.

"11. I further find as a fact that the language in the corrected field notes and patent 'being the tract of land on which the town of Smithland is located' is a specific and definite locative call for a well known artificial object, and that it was the intention of the parties for the Southwest line of the Clark Simmons to meander the Big and Black Cypress so as to include the town of Smithland.

"12. I further find that one of the primary objects of the parties in locating the Clark Simmons on the ground was to so fix it that the Grantee, John Woodley, or his assigns, would have access along its West or Southwest line to the Black and Big Cypress Bayou (Ferry Lake) which was a navigable stream, and so that the survey would include within its boundaries the river port town of Smithland.

(Note: Finding 13, a, b, c, d, e, f, relate to the location of the B. F. Lynn, Isaac Jones, Marvel R. Jones, Henry Lightfoot and Clark Simmons Surveys, and the certificate of Mullens as a part of his corrected field notes wherein in said certificate Mullens states that his survey contained all the vacant land adjoining the survey. The trial court finds that it was Mullens' intent to include all vacant land surrounded by the said described senior surveys on three sides and by the Black and Big Cypress or Ferry Lake on the fourth side.)

"14. I further find as a fact that the patent and corrected field notes of the Clark Simmons, when construed in the light of surrounding circumstances, included the land sued for in this lawsuit as a part of the Clark Simmons Survey. * * *"

(Note: Findings Nos. 15, 16, 17, 18 and 19 are findings to the effect that the various landowners-plaintiffs and their assigns matured title to the land in question by adverse possession under the five- and ten-year statutes of limitation.)

The court made the following additional finding of fact:

"I find that the language in the corrected field notes of the Clark Simmons Survey reading 'situated in Cass County near Black and Big Cypress on Ferry Lake being the tract on which the town of Smithland is located' was added to said field notes in the, General Land Office and is in the handwriting of C. W. Pressler, an employee of the General Land Office."

(Paragraphs 3(a) and 4(f) of the court's findings of fact were amended as hereinbefore shown.)

Conclusions of Law

"1. I conclude that based on the field notes and patent of the Clark Simmons Survey, and construing these documents in the light of all the surrounding facts and circumstances, that the Southwest boundary line of the Clark Simmons was located on and along the Northeast line of Black and Big Cypress Bayou (or Ferry Lake), at the 170 foot elevation above mean sea level. Welder v. State [Tex. Civ.App.], 196 S.W. 868.

"2. I conclude that all other conflicting rules advanced by the parties for the construction of the Simmons field notes and patent must yield to the manifest intention of the surveyor, which I conclude was that the Clark Simmons Southwest boundary line be on and along the Northeast line of Black and Big Cypress Bayous.

"3. I conclude that the calls both written and pictured in the field notes of the Clark Simmons for the survey to be located on the Northeast bank of the Black and Big Cypress Bayous (Ferry Lake) and to 'include the tract of land on which the town of Smithland now stands,' are the most material and certain calls in the field notes and patent, and must control any conflicting calls for course and distance. Stafford v. King, 30 Tex. 257.

"4. I find that the written and pictured directions in the field notes and patent of the Clark Simmons, for that survey to be located on the Northeast .bank of Black

and Big Cypress (Ferry Lake) are calls for a natural object, and that the call for the town of Smithland is a call for an artificial object, which calls must control and override any conflicting call for course and distance. (Idem)

"5. I conclude that after a period of more than 100 years has elapsed since the Simmons was located, during which time has destroyed the original witness trees marked by surveyors R. C. Graham and M. L. Mullens, that the calls for the river and for the town of Smithland, in the light of the surrounding facts and circumstances are the most certain and positive factors in locating the footsteps of the original surveyor. Hart v. Greis [Tex.Civ.App.], 155 S.W.2d 997.

"6. I conclude that the language of the Simmons field notes and patent that the Simmons Survey is 'on the North side of Ferry Lake,' taken in connection with the surveyor's plat and other facts in the case, necessarily implies that the river constitutes the boundary. State v. Atlantic Oil Producing Co. [Tex.Civ.App.], 110 S.W.2d 953, writ refused.

"7. I conclude that the surveyor's plat, drawn by him on his official notes of the Clark Simmons as returned to the General Land Office is reliable evidence that the Black and Big Cypress (Ferry Lake) constitutes the Southwest boundary of the Simmons Survey, and that it was never the intention of the parties to leave any vacancy. Stover v. Gilbert [112 Tex. 429], 247 S.W. 841; Hebert v. McFaddin [129 Tex. 499], 104 S.W.2d 475; Wilkins v. Clawson [37 Tex.Civ.App. 162], 83 S.W. 732; Coleman County v. Stewart [Tex. Civ.App.], 65 S.W. 383; State v. Indio Cattle Co. [Tex.Civ.App.] 154 S.W.2d 308.

"8. I conclude that the Special Certificate placed by M. L. Mullens on his corrected field notes for the Clark Simmons Survey is for all purposes a part of his official field notes and that the field notes and patent must be construed in the light of this special certificate, as well as of the official plat, and of all the surrounding facts and circumstances.

"9. I conclude that the effect of the decisions in the 'Ferry Lake Cases,' and in particular the decisions of the United States Appellate Courts in Jeems Bayou Hunting & Fishing Club v. United States [5 Cir.], 274 F. 18; [United States v. Jeems Bayou Hunting & Fishing Club, 260 U.S. 561], 43 S.Ct. 205 [67 L.Ed. 402]; and in Greene v. United States [5 Cir.], 274 F. 145, are stare decisis of the mean *high* water level of Ferry Lake in 1839, and 1812, and so fix such mean *high* water level on the dates shown at 173.09 feet elevation above mean sea level.

"10. I conclude that by utilizing the mean *high* water level as established in the Ferry Lake cases and by using the other undisputed facts regarding the average *low* water level of Ferry Lake during the raft period is fixed very closely if not exactly on the gradient boundary of Big and Black Cypress, as a gradient boundary is to be determined by the principles announced in the United States Supreme Court in the case of [State of] Oklahoma v. Texas, 265 U.S. 500, 44 S.Ct. 573 [68 L.Ed. 1121]; also in Diversion Lake Club v. Heath, 126 Tex. 129, [86] S.W.2d 441.

"11. I conclude that under the doctrine of the Supreme Court of Texas announced in Urquhart v. Burleson, 6 Tex. 502, and Johns v. Schutz, 47 Tex. 578, the call in the field notes and patent of the Clark Simmons for it to include the 'tract of land on which the town of Smithland is now located,' necessarily requires the Southwest line of the survey to be so run along the river, as to include said townsite."

(Note: Conclusions 12, 13, 14, and 15, are to the effect that the various landowners plaintiffs and their assigns matured title by limitation, some under the five- and ten-year statute and others under the ten-year statute of limitation, and owned the various tracts described therein.)

The record in this case is massive and voluminous, consisting of 15 volumes of varying size, including testimony of witnesses, documentary evidence, maps, plats, photographs, exhibits and other matters. The case has been well tried and well briefed by able counsel representing the respective parties to this suit.

Appellants present 51 points in their brief wherein they contend in essence that the trial court erred in making his various findings and holdings; and that the trial court erred in rendering judgment against defendants because there was no evidence to support such judgment, that such judgment was contrary to the undisputed evidence and because such judgment was against the overwhelming preponderance of the evidence and appellants also present other matters. Despite appellants' numerous points, the ultimate issues are few. Appellants' brief states:

"Despite the formidable-appearing record, the ultimate issues in this case can be briefly and simply stated. * * *

"This brief is therefore directed to two principal 'points', viz.:

"1. The error of the trial court in finding and holding that the Simmons Survey is bounded on the Southwest by Black and Big Cypress Bayous, and not by a straight line running South 45 degrees east from its west corner (the forked water oak corner) as called for in its field notes and patent.

"2. The error of the trial court in finding as a fact that the forked water oak tree called for as the west corner of the Simmons originally stood on the ground at the point (near the water's edge) represented by figure 196 on Plaintiffs' Map, Exhibit No. 186."

Appellants contend that the calls in the Clark Simmons field notes to be "on Ferry Lake" and to include "the tract on which the town of Smithland now stands" were descriptive rather than locative. Appellants also contended in the trial court, and

now contend, that the old town of Smithland was not located on the river as found by the trial court but was located on a hill beyond the 129 acres in controversy, and now contend that there was no evidence to support the finding of the trial court with respect to its location of the old town of Smithland and that same was contrary to the overwhelming weight and preponderance of the evidence, etc.

The early landmark case of Stafford v. King, 30 Tex. 257, which has been cited many times with approval by our Texas Supreme Court, contains an excellent discussion of the general rules of construction with reference to boundary cases. We quote from said authority as follows:

"It has often been said by this court that the general rules are, that the location should be governed, first, by natural objects or boundaries, such as rivers, lakes, creeks, etc.; second, artificial marks, such as marked trees, lines, stakes, etc.; and third, course and distance.

*"The true and correct location of the land is ascertained by the application of all or any of these rules to the particular case. And when they lead to contrary results or confusion, that rule must be adopted which is most consistent with the intention apparent upon the face of the patent, read in the light of the surrounding facts and circumstances.*

"The rule stated by Chief Justice Marshall, in Newson v. Pryor's [Lessee], 7 Wheat. 7 [5 L.Ed. 382], is, *'that the most material and most certain calls shall control those which are less material and less certain. A call for a natural object, as a river, a known stream, a spring, or even a marked tree, shall control both course and distance.'* [Urquhart v. Burleson], 6 Tex. 502; [Watrous v. Rodgers], 16 Tex. 110; [Hubert v. Bartlett], 9 Tex. 97, 103; [Mitchell v. Burdett], 22 Tex. 633.

*"Of all these indicia of locality of the true line, as run by the surveyor, course*

*and distance are regarded as the most unreliable,* and generally distance more than course, for the reason that chain-carriers may miscount and report distances inaccurately, by mistake or design. At any rate, they are more liable to err than the compass. The surveyor may fall into an error in making out the field-notes, both as to course and distance (the former no more than the latter), and the commissioner of the general land office may fall into a like error by omitting the lines and calls, and mistaking and inserting south for north, east for west. And this is the work of the officers themselves, over whom the locator has no control. *But when the surveyor points out to the owner rivers, lakes, creeks, marked trees, and lines on the land, for the lines and corners of his land, he has the right to rely upon them as the best evidence of his true boundaries, for they are not liable to change and the fluctuations of time, to accident or mistake, like calls for course and distance; and hence the rule, that when course and distance, or either of them, conflict with natural or artificial objects called for, they must yield to such objects, as being more certain and reliable.*

"There is an intrinsic justice and propriety in this rule for the reason, that the applicant for land, however unlearned he may be, needs no scientific education to identify and settle upon his land, when the surveyor, who is the agent of the government, authoritatively announces to him that certain well-known rivers, lakes, creeks, springs, marked corners, and lines constitute the boundaries of his land. But it would require some scientific knowledge and skill to know that the courses and distances called for are true and correct, and with the aid of the best scientific skill, mistakes and errors are often committed in respect to the calls for course and distance in the patent. The unskilled are unable to detect them, and the learned surveyor often much confused.

"Although course and distance, under certain circumstances, may become more important than even natural objects—as when, from the face of the patent, the natural calls are inserted by mistake or may be referred to by conjecture and without regard to precision, as in the case of descriptive calls—*still they are looked upon and generally regarded as mere pointers or guides, that will lead to the true lines and corners of the tract, as, in fact, surveyed at first.*

"*The identification of the actual survey, as made by the surveyor, is the desideratum of all these rules. The footsteps of the surveyor must be followed, and the above rules are found to afford the best and most unerring guides to enable one to do so.*

"There is another rule to be observed in estimating these natural and artificial calls. They are divided into two classes: descriptive or directory, and special locative calls. The former, though consisting of rivers, lakes, and creeks, must yield to the special locative calls, for the reason that the latter, consisting of the particular objects upon the lines or corners of the land, are intended to indicate the precise boundary of the land, about which the locator and surveyor should be, and are presumed to be, very particular; while the former are called for without any care for exactness, and merely intended to point out or lead a person into the region or neighborhood of the tract surveyed (Wright v. Mabry, 9 Yerg., Tenn., 55), and hence not considered as entitled to much credit in locating the particular boundaries of the land when they come in conflict with special locative calls, and must give way to them." (Emphasis added.)

█ The general rules of construction in boundary cases enunciated by the Supreme Court of Texas in Stafford v. King, supra, in no wise run counter to the rule that in relocating old grants the important thing is to follow the footsteps of the original surveyor. That is what is being done when one looks into the surveyor's field notes and in the patent for all of the factors there included expressive of the intention

of the parties. However, as time passes and as many of the ancient landmarks may have disappeared, our courts have held that evidence is admissible in locating old grants which pass the test that it is the best evidence available. Hart v. Greis, Tex.Civ. App., 155 S.W.2d 997, error ref. w. o. m.; Turnbow v. Bland, Tex.Civ.App., 149 S. W.2d 604, writ dism.; Taylor v. Higgins Oil & Fuel Co., Tex.Civ.App., 2 S.W.2d 288, writ dism.

■ It is also well-settled law that the rules which govern the courts in the construction of grants and for ascertaining their boundaries are all designed for the purpose of carrying out the intention of the contracting parties and that when this intention is once made manifest, all else must yield to and be governed by it. Swisher v. Grumbles, 18 Tex. 164; Woods v. Robinson, 58 Tex. 655; Wheeler v. Stanolind Oil & Gas Co., 151 Tex. 418, 252 S.W.2d 149; Robertson v. Mosson, 26 Tex. 248, 249; Welder v. State, Tex.Civ. App., 196 S.W. 868, writ ref.

■ In boundary cases where ambiguities arise either on the face of the field notes or where applying them to the ground, *the surrounding facts will be looked to to ascertain the intent of the grantor and grantee,* and that where two descriptions exist, one erroneous and the other correct, the latter will prevail. State v. Franco-American Securities, Ltd., Tex.Civ. App., 172 S.W.2d 731; Wilson v. Giraud, 111 Tex. 253, 231 S.W. 1074; Stafford v. King, 30 Tex. 257.

Also irrespective of the comparative dignity of conflicting calls it has been held that the *manifest intention* of the contracting parties (ascertained upon the face of the grant and read in the light of the surrounding facts and circumstances) must prevail. In Livingston Oil & Gas Co. v. Shasta Oil Co., Tex.Civ.App., 114 S.W.2d 378, 381, it is stated:

" 'Rules for ascertaining boundaries are for the purpose of carrying out the intention of the parties, which inten-

tion is to be ascertained upon the face of the grant, read in the light of the surrounding facts and circumstances.' When the description is applied upon the ground and inconsistencies are developed, the call 'which will defeat that intention is rejected as false regardless of the comparative dignity of the conflicting calls.' Miller v. Southland Life Ins. Co., Tex.Civ.App., 68 S.W.2d 558, 560; Tex. Pacific Coal & Oil Co. v. Crabb, [Tex.] Com.App., 249 S.W. 835."

It is also a well-settled rule of construction in boundary cases that the most material and certain calls in the field notes and patent will control those which are less material and less certain. Stafford v. King, supra; Newson v. Pryor, supra; Krider v. Winterman, Tex.Civ.App., 108 S.W.2d 452.

The case of State v. Atlantic Oil Producing Co., Tex.Civ.App., 110 S.W.2d 953, 954, writ refused, holds specifically that the locating language of a patent " 'on the north side of the Sabine River' " *implied that the river constituted the boundary.*

Ferry Lake (now called Caddo Lake) and the rivers or bayous known as Big Cypress and Black Cypress all comprise a part of Ferry Lake and reference to same is often made in the name of Ferry Lake.

The great Red River Raft, which consisted of a natural log-jam of fallen trees and debris in the Red River, was formed and existed for many, many years prior to 1839, and existed thereafter until 1874. This raft operated to a certain extent as a natural dam, affecting to some extent the depth of water in the various watercourses connected to and affected by Red River. The great Red River Raft was removed by the U. S. Army Engineers in 1874.

There is in the record a vast amount of ecological, geological, documentary and other evidence (including the findings of the Special Master and the court decisions in the Ferry Lake cases referred to by the trial court in his findings and conclusions)

with reference to the mean high water elevation and mean or average elevation of Ferry Lake or of Big and Black Cypress Bayous or rivers in the immediate vicinity of the Clark Simmons survey during the period of 1839–1874.

We have carefully considered all of the evidence in the record and it is our opinion that there is ample evidence of probative force in this case to support the trial court's findings that the mean high water elevation of Ferry Lake and of Cypress Bayou opposite the old town of Smithland during the period in question (1839–1874) was 173.09 feet above mean sea level and that the mean or average elevation of Ferry Lake or of Big and Black Cypress Bayous in the immediate vicinity of said Clark Simmons survey during the period in question (1839–1874) was 170 feet above mean sea level.

It is our further opinion that these findings of the trial court are not contrary to the overwhelming weight and preponderance of the evidence.

Plaintiffs' Exhibit No. 1 is a map which shows the Clark Simmons survey in connection with all of the pertinent adjacent and surrounding surveys. The block of river surveys colored green on said map, being the B. F. Lynn, the two David Lane, and the two I. N. Jones surveys, were surveyed in 1838 by Baker.

The next survey laid down in the area was a 640-acre survey, later canceled, surveyed March 26, 1840, for William F. Johnson. The field notes for the Johnson recited that it was located along the meanders of Big and Black Cypress "immediately below the mouth of Black Cypress, including as is now known the town of Smithland." Johnson called for the West corner to begin at a stake on the bank of the Black Cypress. At the South or Southeast corner Johnson recited that it was marked by: "White oak tree on the bank of the Cypress mkd X." The area of the canceled Johnson survey lies wholly within the Clark Simmons survey as the Simmons survey was located by the

trial court as extending to Cypress or Ferry Lake.

The Isaac Jones and Marvel Jones surveys were located by Tipps in 1841. Later in 1841 (May 1, 1841) surveyor Tipps returned original field notes for the William K. Allen survey, shown in brown on Plaintiffs' Exhibit 1. This Allen survey was separated from the Clark Simmons by what was then a vacant area later occupied by Lightfoot.

On June 6, 1844, R. C. Graham surveyed and wrote out the original field notes of the Clark Simmons survey. We quote from these field notes as follows:

"Beginning at a forked water oak *standing on the North side of Ferry Lake* at or near the Junction of Big Cypress and Black Cypress brs Elm S 92 E 8½ vrs brs pine S 70 E *all marked JW*

"Thence North 45 East 3300 vrs to a stake standing on the South Boundary Line of Marvel Jonesis Tract of Land Bearing Black Oak S 20 E 14 vrs other Bearing black oak S 49 E 24 vrs *both marked JW*

"Thence East with said Marvel Jonesis line to Isaac Jonesis South Boundary Line thence with said line 2100 varas to a black oak Bearing Black Oak S 70 W 10 vrs other Bearer Black Oak Bearing S 81 W 33 vrs *all marked JW*

"Thence South 45 West 4800 varas *to a water oak standing on the bank of Ferry Lake* Bearing Water Oak N 14 W 6 vrs Bearer Sassafras N 40 W 16 vrs

"Thence North 45 West 1492 vrs to the beginning.

"John Woodley      "R. C. Graham DSBC Marker."

(Emphasis added.)

These field notes recite: "John Woodley, Marker." Dr. John Woodley, the assignee of Clark Simmons, was the owner

of the certificate for whom the survey was made. Prior to January 20, 1846, Dr. Woodley died and on that date his partner, George Smith, qualified as administrator of Dr. Woodley's estate. In 1857, said administrator through the Probate Court sold Woodley's land, "Known as the Smith-land tract," called to be 1,077 acres (the original field notes of Graham on the Clark Simmons called for 1,071 acres) to the purchaser Scott. In December, 1847, M. D. K. Taylor acquired title to the east 259 acres of the Clark Simmons and Daniel Frazer acquired an adjoining 312 acres. On March 16, 1849, George Smith and John Scott sold to James D. Todd 506 acres, in which conveyance it was recited: "The same being known as the tract upon which Smithland is situated in the plan of the survey made for John Woodley on the Headright certificate of Clark Simmons." James D. Todd's wife was Susan Todd. The Todd land (except for a short period of time in 1859) remained in the ownership of Todd and wife from 1849 to 1889, when Mrs. Todd sold it to her two daughters and in her deed to them described the West corner as "Beginning at a double water oak (now down)," and after making other calls closed the metes and bounds description by coming up the meanders of Cypress to the place of beginning.

On April 5, 1850, Kimbell returned field notes for the Henry S. Lightfoot survey (colored green on Plaintiffs' Exhibit 1) for George Smith, who was administrator of Dr. Woodley's estate. The first call of the Lightfoot survey was "Beginning at *a double water oak marked JW on the Bank of Black Cypress near its mouth.* * * * Thence N 47 E with the N.W.B. line of a survey in the name of Clark Simmons 3,475 varas a stake in SB line of a Survey in the name of Marvel Jones and at the N.W. corner of said Woodley Survey." The beginning corner of the Light-foot survey was fixed by the trial court at Point 196, which the trial court found was the same position on the ground for the original West corner of the Clark Simmons as located originally by Graham.

On November 2, 1850, surveyor Mullens wrote corrected field notes for the Clark Simmons, the material portions of which are as follows:

"Situated in Cass County near Black and Big Cypress *on Ferry Lake being the tract on which the town of Smith-land is located*

"Beginning at the S.E. corner of a 640 Acre Survey in the name of Isaac Jones, and on the N.W. boundary of a Survey made for B. F. Lynn, a Stake from which a pine bears S. 45° W 8 vs off, another pine bears N 70° W. 6 vs. off *both marked JW,*

"Thence West 1746 varas to a stake standing on the S. Boundary line of Marvel R. Jones 640 Acres Survey from which a Black Oak bears S 20° E 14 off another Black Oak S 29° E 24 vs off *both marked JW.*

"Thence South 45 W. 3300 varas, to *a forked water oak standing on the N side of Ferry Lake, and near the junction* of Big Cypress & Black Cypress from which an elm bears S. 92° E 8½ vs off, a pine bears S 70° E. *all marked JW.*

"Thence South 45 E. 1389 varas to B. F. Lynn's N.W. boundary line.

"Thence North 45 E. along the N.W. boundary of B. F. Lynn's Survey to the Beginning.
                    "M. S. Mullens C.S.C.C.

"M. D. K. Taylor⎫
"J. R. Watson  ⎬ Chm
              ⎭

"The State of Texas
  County of Cass

"I, Matthew L. Mullens, County Surveyor of Said County & State, certify under oath of my office that the foregoing metes and bounds contains *all of the vacant land adjoining said*

*survey,* and that it is a corrected survey of a survey made by R. C. Graham, D. S., Bowie District, on June 6 day A.D. 1844.

"Given under my hand this Nov. 2nd A.D. 1850.

M. S. Mullens C.S.C.C."
(Emphasis added).

Mullens also drew an official plat of the Clark Simmons survey which was a part of his corrected field notes which pictured description of the survey shows the survey as extending to Ferry Lake, or Cypress, for its Southwest line.

The patent was issued on February 4, 1854, carrying the material portions of Mullens' field notes (including the portions interlined therein by the Land Office) into the patent.

In 1860 surveyor Hensey located the Samuel F. Moseley survey (colored brown on Plaintiffs' Exhibit 1) in which its most eastern Southeast corner is made coincident with the South corner of the Lightfoot and the West corner of the Simmons at Point 196. In his run to the most eastern Southeast corner of the Moseley, common with the South corner of the Lightfoot and the West corner of the Clark Simmons, the description is:

."Thence S. 28 E. with said Smith line at 280 vs. the S. Cor of same and *the West cor. of Woodley's survey on the bank of the Lake a double water oak corner.*"

The trial court found this corner of the Moseley to be common with the ground position of the South corner of the Lightfoot and West corner of the Clark Simmons, on the present bank of Black Cypress and at Point 196 shown on Plaintiffs' Exhibit 186.

■ Voluminous evidence was introduced by the parties with reference to their contentions relative to the location of the old town of Smithland during the period in question. A review of this evidence would greatly lengthen this opinion. We have carefully examined and considered this great mass of evidence and have reached the conclusion and so hold that there was ample evidence of probative force to sufficiently support the trial court's finding of fact that the old town of Smithland during the period in question was a port town located on the river or Ferry Lake where Thompson's Camp is presently located and as shown on Plaintiffs' Exhibit 186. We further hold that this finding of fact of the trial court is not contrary to the overwhelming weight and preponderance of the evidence.

We think the patented field notes of the Clark Simmons survey are ambiguous both on their face and when applied to the ground. The naked course and distance calls in such field notes fail to close. Neither the forked water oak called to be standing *on the North side of Ferry Lake* nor its witness trees were found nor were any of the corner or witness trees found, nor were any of the remains of such trees found, but their original positions were found by the trial court upon ample evidence and fixed in his findings. Appellants, however, contend vigorously that the Southwest line of the Clark Simmons must be located as a straight line by the call to run from the forked water oak (which forked water oak they place at a considerable distance away from the bank of Ferry Lake or the river) "Thence S 45 E 1389 vrs to B. F. Lynn N.W. Boundary." Appellants try to fix the location of this forked water oak corner by selecting the 3,300 varas distance called for in the field notes but they would ignore its description in the field notes to be "standing on the N. side of Ferry Lake" and would also ignore the description of the same tree in the Lightfoot and Moseley field notes for it to be "on the North Bank" of the river or Ferry Lake.

As we view it the one overriding natural object in the area where the Clark Sim-

mons survey was to be located was and is Ferry Lake and the Cypress rivers or bayous. The call to go to the forked water oak "standing on the N. side of Ferry Lake," which the trial court found to be the same tree that was called for in the Lightfoot and Moseley surveys to be on "the North Bank" of the river or Ferry Lake (together with Mullens' official plat showing the S.W. line of the survey to be the river or lake) firmly anchor the corner in question to the north bank of Ferry Lake or the river and this with the official plat and other evidence in the case implies that the river or Ferry Lake constituted the S.W. boundary of the Clark Simmons. See State v. Atlantic Producing Co., Tex.Civ.App., 110 S.W.2d 953, writ refused.

Appellants' course and distance S.W. call to be a straight line is not in harmony with the call for the survey to be "on Ferry Lake", nor with the plat showing the survey to be riparian, nor with the certificate attesting that there was no vacancy left, nor with the call to include a known artificial object "the town of Smithland" which town the trial court found to be firmly anchored to the river during the period in question.

Appellants attack the calls for the survey to be "on Ferry Lake" and to include the town of Smithland as being directory or descriptive rather than locative. The trial court found that the calls were intended to be locative in nature. Appellants also apparently would ignore the further rule that irrespective of whether these calls might be construed to be locative or descriptive that they were a definite part of the official field notes of the patent *and must be considered in determining intent.* In Livingston Oil & Gas Co. v. Shasta Oil Co., supra, 141 S.W.2d 378, it is stated:

"'When the description is applied upon the ground and inconsistencies are developed, the call which will defeat that intention is rejected as false *regardless of the comparative dignity of the conflicting calls.'*"

■ Appellants also apparently seek to avoid the binding effect of the calls for the survey to be on Ferry Lake and to include the town of Smithland by proof that these calls were interlined in the corrected field notes by C. W. Pressler, an official of the General Land Office, rather than being in the handwriting of the surveyor Mullens. We think this insertion but serves to emphasize the importance that the Land Office gave to this interlined portion. We must assume that the Land Office had a pertinent and valid reason for the making of such insertion and we must certainly give verity to this ancient act of the Land Office made more than 100 years ago and made prior to the issuance of the patent. The language in question is a definite part of the official field notes and was included in the patent which passed title to the land and its inclusion in the patent certainly precludes any collateral attack on it now in this lawsuit.

■ It is our considered judgment that the language of the official field notes and patent of the Clark Simmons survey together with the official field note plat, when considered with the evidence in this case, make the river (or Ferry Lake) a natural object used as a locative call and make it the most material and certain call in the field notes. This is now especially true since the trees called for can not now be found but the natural object of Ferry Lake or the river is still on the ground.

It is our further view that the call in the corrected field notes and patent for the Clark Simmons survey to include the tract of land on which the town of Smithland is located, requires that the town of Smithland (in its position at Thompson's Camp firmly anchored to the river as found by the trial court upon ample evidence) be treated as an artificial object and that the Southwest line of the Simmons must be run so as to include the town of Smith-

land on the North bank of Big Cypress Bayou (or Ferry Lake). Urquhart v. Burleson, 6 Tex. 502; Johns v. Schutz, 47 Tex. 578; Southern Pine Lumber Co. v. Whiteman, Tex.Civ.App., 104 S.W.2d 635.

It is our further opinion that the trial court's findings of fact locating the forked water oak corner in question at Point 196 and locating the other various corners and lines of the Clark Simmons survey are amply supported by evidence of probative force and are not contrary to the overwhelming weight and preponderance of the evidence.

We hold that the able and learned trial judge correctly rendered judgment for plaintiffs.

Each and all of appellants' points have been carefully considered and are respectfully overruled.

The judgment of the trial court is affirmed.